The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner, with some modification. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Plaintiffs average weekly wage is $413.20, yielding a compensation rate of $275.48.
4. The day of plaintiffs alleged injury is October 14, 1994.
5. On October 14, 1994, plaintiff sustained a low back strain as a result of a specific traumatic incident of the work assigned in the course and scope of his employment with defendant-employer.
 ***********
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact of the Deputy Commissioner with minor modifications as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 53-year-old male, born March 28, 1944 who served twenty-one years in the military. On March 9, 1988, plaintiff began working with defendant-employer as a press operator and was so employed from March 9, 1988 through April 7, 1994. As a press operator plaintiff would pull 500-pound molds every six and one-half minutes. During that time a mold would complete a cure cycle. Plaintiff was required to load the pre-former cavities with fourteen core bars made of rubber. These items had to be loaded precisely because a pin had to be inserted to hold them straight. Plaintiffs work was assessed in terms of quality and quantity. Once the mold dropped, it had to be removed so that the rubber would not be over cured. Thereafter, plaintiff would grasp the grips and pull the mold out. He would break open the mold with his left hand and use a flashing knife with a round handle to cut it open. He removed the fourteen core bars and hung them. He would use the air hose to clean the mold. He would then restart the process by loading the mold. While the mold was cooking for the next six and one-half minutes, plaintiff went back to the original hanging fourteen grips and cut the webbing with scissors and trimmed the flashing off the grips while being careful not to cut the grips themselves. While trimming the flashing, plaintiff would push the grip forward and trim the right side and then go up and down the left side. Plaintiff would then reach under the grips and gather up the flashing, pull it off with his hands and throw it away. Plaintiff was required to do 52 heats in an eight-hour period, every six and one-half minutes. This includes the entire cycle of loading, emptying, reloading and trimming as well as repairing work with the pins and readjusting improper alignments. Plaintiff worked five days a week, eight hours per day.
2. From April 1994 through October 1994, plaintiff was a relief operator in the core prep area. In this job plaintiff had to use his hands to pull rubber scraps apart which were holding pieces together and sometimes used his right hand with scissors because the materials were tough. Plaintiff used his hands constantly in this job using a variety of movements but especially used his right hand to manipulate the scissors. Plaintiff was experiencing problems with his thumb, middle finger and ring finger.
3. Plaintiff had been a dye cutter for approximately four months when he injured his back on October 14, 1994 and worked in that position until August 1995. As a dye cutter, plaintiff was required to run 400-pound short rolls of rubber on a machine. A forklift would bring in the rolls, but plaintiff would have to roll the 400-pound roll the last 25 to 50 feet, turning it so that it could be rolled into position behind the dye cutter machine. The roll of rubber was on the floor like a roll of carpet and plaintiff was required to bend over and roll it. To get the roll on the machine, the roll had to be turned 90 degrees. After the roll was in the machine the plastic covering had to be cut off with a knife, the plastic rolled off and then plaintiff had to grasp the rubber with both hands to fit it through the first roller, over the second roller and through the tension bar, to and through the doff box and then pull it to the back of the dye machine through two rollers there. Thereafter, the machine would pull the rest of the rubber through. As the machine ran, each time the dye cutter came down plaintiff had to cut the rubber with scissors to remove waste. Plaintiff would then turn the scissors upside down to complete the process. After there are thirteen stacks on each tray, the machine stops and the plaintiff is required to rip all the waste and excess flashing off and throw it away. Plaintiff did this by holding the stacks with his left hand and pulling the flashing with his right hand.
4. On October 14, 1994, plaintiff was rolling one of the 400-pound rolls of rubber to load the dye machine. Plaintiff was attempting to turn the corner with the 400-pound roll while pushing the roll with his left hand and lifting the roll with his right hand. As plaintiff bent over to roll the roll around the corner, he felt a sudden and immediate onset of pain. He felt his back "explode as if it were on fire and felt pain in his legs and at his neck.
5. Plaintiff properly reported this incident to his supervisor, Alex Walls. He attempted to continue his shift but eventually was unable to work. Plaintiff filled out an accident report and went to the Scotland Memorial Hospital emergency room.
6. Plaintiff had experienced some minor back problems in the past, but did not experience any incapacity to work. The previous problems had not required significant medical intervention. At the time of plaintiffs injury on October 14, 1994, plaintiff experienced pain in his right hip, right leg, some pain in his entire back, neck pain and shoulder pain.
7. Plaintiff continued to experience pain after being treated at the emergency room and, pursuant to the instruction of defendant-employer, presented to Scotland Urgent Care on October 25, 1994. Plaintiff was initially seen by a physicians assistant and complained of aches between the shoulder blades, tingling in the right arm and pain in both calves. Plaintiff was placed on restricted duty with no lifting greater than twenty pounds. X-rays showed degenerative changes of the lumbar and thoracic spine.
8. On October 25, 1994, plaintiff first was treated by Dr. Eve Hanna, a board-certified emergency medicine physician. Plaintiff complained of pain in the back, legs, between the shoulder blades in the upper back, in the neck and right arm. Plaintiff was diagnosed as suffering from muscle strain with spasm and was restricted to no lifting greater than ten pounds, no bending and twisting. Plaintiff continued conservative treatment including physical therapy. Plaintiff continued to work with defendant-employer on light duty.
9. Plaintiff worked approximately one week of light duty before he was sent home because of the pain. Plaintiff again saw Dr. Hanna on November 1, 1994 and complained of arm numbness, lower back pain and upper back and neck pain. Plaintiff continued on conservative treatment and restrictions.
10. After plaintiff continued to experience pain, he was sent by defendant-employer to Dr. Glenn Subin, a board-certified orthopedist and hand surgeon. Plaintiff presented to Dr. Subin on November 30, 1994 complaining of low back pain and was diagnosed with low back injury with intermittent right-sided radicular symptoms. Plaintiff received conservative treatment and restrictions of lifting no greater than twenty pounds. Plaintiff attempted to work but required assistance from co-workers.
11. On December 14, 1994, plaintiff returned to Dr. Subin complaining of neck and shoulder problems. Plaintiff was continued on physical therapy and medication and was given a return to work order. Plaintiff returned to Dr. Subin on February 10, 1995 complaining of neck and upper back problems with tingling and numbness in both arms. On February 13, 1995, a MRI revealed left lateral recess stenosis with diffuse degenerative joint disease, disc bulging and osteophytic changes at C6-7 and degenerative disc disease at C4-5 and C5-6, but without herniation or canal stenosis. Although plaintiff continued to have pain, he was released by Dr. Subin on December 14, 1994 to return to work regular duty with no restrictions.
12. Plaintiff continued to experience pain in his back, neck, shoulder and arms. Plaintiffs hands and arms were tingling and burning with numbness in his hands. Plaintiff informed his supervisor of his condition and requested assistance from the plant nurse in obtaining permission for medical treatment. Plaintiff eventually sought relief from his family physician and obtained a referral to Dr. Ward Oakley, a board- certified orthopedic surgeon.
13. Plaintiff presented to Dr. Oakley on February 1, 1995 complaining of neck and upper extremity pain, which had been developing since his October 1994 injury. Plaintiff was diagnosed with cervical radiculopathy and/or carpal tunnel syndrome. After nerve conduction tests revealed that plaintiff had bilateral carpal tunnel syndrome, plaintiff was referred on March 6, 1995 to a neurosurgeon for his neck problems. On March 16, 1995, plaintiff underwent a right-sided carpal tunnel release performed by Dr. Oakley. He underwent a left-sided carpal tunnel release performed by Dr. Oakley on April 20, 1995. Thereafter, plaintiff was placed in wrist braces for four weeks and was released to return to work without restrictions from the standpoint of his carpal tunnel syndrome on July 1, 1995. On July 1, 1995, plaintiff reached maximum medical improvement for his bilateral carpal tunnel syndrome, retained a 5% permanent partial impairment to each hand and was released to return to regular duty without restriction. Plaintiff returned to Dr. Oakley on August 28, 1995 complaining of stiffness and swelling in his joints, hands, shoulders, back, neck and almost everywhere. Dr. Oakley stated that plaintiff might be suffering from rheumatoid arthritis or fibromyalgia and referred plaintiff to a rheumatologist.
14. Dr. Subin stated that plaintiffs carpal tunnel syndrome could have been caused by his repetitive work. Dr. Oakley stated that plaintiff was at an increased risk of developing carpal tunnel syndrome than members of the general public not so employed.
15. Plaintiff was referred by Dr. Oakley to Dr. Malcom Shupeck, a board-certified neurosurgeon, and plaintiff presented to Dr. Shupeck on April 4, 1995 complaining of neck pain, left arm pain and numbness and tingling in both hands. Dr. Shupeck diagnosed plaintiff as having possible cervical radiculopathy but mostly neck pain. Dr. Shupeck did not give plaintiff any restrictions since he had been out of work since March 15, 1995. Plaintiff returned to Dr. Shupeck on July 24, 1995 and was back at work but complained of neck, left shoulder and arm pain.
16. On August 14, 1995, plaintiff returned to Dr. Shupeck complaining of headache, back and neck pain, numbness of the fingers of both hands, soreness of the joints of the hands, shoulders and arms. Dr. Shupeck placed plaintiff on restrictions of no lifting greater than ten pounds, no repetitive bending and frequent change of position.
17. In August 1995 plaintiff began working on seamless painting where he painted the logo on gauze grips. Plaintiff used four-inch wooden q-tips, which he would hold in his right hand and hold the grip in his left hand to paint the logo. In another method, plaintiff would use a hypodermic- type needle to color the logo. Plaintiff was in this position from August 1995 through March 6, 1996. In February 1996, plaintiff was out on family medical leave due to the illness of his mother. He returned to work from February 7, 1996 through February 29, 1996 in the seamless painting job. He then obtained an excuse to be out of work from a physicians assistant which expired on June 16 or 17, 1996. Plaintiff never returned to that job. Plaintiff did not have a medical excuse to be out of work after June 17, 1996; therefore, his employment was terminated after three unexcused absences.
18. By February 26, 1996, plaintiff presented to Dr. Shupeck complaining of diffuse pain, which was not consistent with any nerve root compression pattern. A March 3, 1996 bone scan indicated uptake in the thoracic and lumbar spines, sacroiliac joint, both knees and ankles consistent with degenerative or arthritic changes. Plaintiff also presented to Dr. Shupeck on March 11, 1996, April 1, 1996 and May 3, 1996. In each instance plaintiff was experiencing more symptoms on the right than on the left, but plaintiff did not have any surgically treatable lesions on the right. On April 1, 1996, plaintiff was diagnosed with chronic pain syndrome by Dr. Shupeck, and on July 9, 1996, plaintiff was diagnosed with cervical spondylosis. Dr. Shupeck stated that plaintiffs MRI findings were more chronic than acute and were due to wear and tear and degenerative changes and not due to trauma. However, he was of the opinion that plaintiffs symptoms could have been exacerbated by his trauma. Dr. Shupeck believed plaintiffs back symptoms could have been caused by his October 14, 1994 injury.
19. Plaintiff continued to experience pain, and on January 28, 1997, presented to Dr. Michael Haglund at Duke University on referral from Womack Hospital. Plaintiff was complaining of back and left leg pain. A February 4, 1997 MRI revealed congenital narrowing of the spinal canal, degenerative disc disease and increased size of the joints narrowing the spinal canal at L4-5. This MRI also revealed degenerative disc disease of the cervical spine. Dr. Haglund was of the opinion that plaintiffs congenital stenosis, combined with degenerative disc disease, was causing nerve impingement. On March 19, 1997, plaintiff underwent a laminectomy with bilateral foraminotomies at L4-5. Plaintiff continued to have left leg and back pain, and Dr. Haglund stated that on October 13, 1997 plaintiff reached maximum medical improvement of his back from a medical standpoint and retained a 15% permanent partial disability of the back. Plaintiff has not reached maximum vocational improvement.
20. Dr. Haglund stated that plaintiff has a congenitally narrow spinal canal, which made any injury more significant. The injury accelerated plaintiffs degeneration of the joints, which caused them to enlarge. That process probably resulted in some bulging of plaintiffs disc, which narrowed the canal even more, and led to the spinal stenosis causing plaintiffs problems. Plaintiff may have had some low-level amount of degeneration before, but plaintiffs October 14, 1994 injury accelerated plaintiffs degeneration, which in turn accelerated and exacerbated his spinal stenosis.
21. Dr. Haglund placed plaintiff under a permanent restriction of no heavy lifting or engaging in long periods of bending and stooping. Plaintiff is unable to do any heavy-duty work with repeated twisting and turning. Plaintiff is restricted to 35 pounds of lifting with no constant bending, stooping, twisting and turning. Dr. Haglund does not believe that plaintiff is unable to work.
22. On or about October 14, 1994, plaintiff contracted bilateral carpal tunnel syndrome, which was caused by the repetitive work required by his employment with defendant-employer.
23. Plaintiffs employment with defendant-employer exposed him to a greater risk of contracting bilateral carpal tunnel syndrome than members of the general public not so employed.
24. As a direct and proximate result of his work-related bilateral carpal tunnel syndrome, plaintiff was unable to engage in physical activities required by his former job or any other job from March 16, 1995 through and including July 10, 1995.
25. Plaintiff reached maximum medical improvement with respect to his carpal tunnel syndrome on July 1, 1995 and retained a 5% permanent partial disability to each hand as result thereof.
26. On October 14, 1994, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant- employer, when as he was pushing, lifting and turning an approximately 400 pound roll of rubber. Plaintiff experienced an immediate and sudden onset of back pain.
27. As a direct and proximate result of plaintiffs compensable injury by accident, plaintiff sustained an injury to his back including but not limited to an acceleration and exacerbation of his degenerative disc disease and spinal stenosis resulting in lumbar, thoracic and cervical pain.
28. Plaintiff reached maximum physical, medical improvement on October 13, 1997 and retained a 15% permanent functional impairment of the back. However, plaintiff has not yet reached maximum vocational improvement.
29. As a direct and proximate result of his compensable injury by accident, plaintiff, due to his back condition and resulting back pain, was unable to engage in physical activities required by his former job or any other job from March 7, 1996 and continuing.
30. The defense of this claim was reasonable and not stubborn, unfounded litigousness. Plaintiff is not entitled to attorneys fees pursuant to N.C. Gen. Stat. 97-88.1.
31. Plaintiff reported his hand symptoms to defendant-employer through his supervisors and the plant nurse. Plaintiff also requested the plant nurse to obtain permission for him to receive treatment for his hand symptoms. Thus, defendant-employer had notice that plaintiff had hand symptoms, which might be caused by his job. Plaintiff had a reasonable excuse not to provide written notice to defendant-employer regarding such hand symptoms as he had notified his supervisors and the plant nurse. Defendant-employer was aware of plaintiffs symptoms and medical complaints, but failed to provide any additional treatment to plaintiff or to provide him with any further evaluation. Defendant-employer was not prejudiced by plaintiffs failure to provide written notice of his bilateral carpal tunnel syndrome within 30 days.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiffs bilateral carpal tunnel syndrome was caused by and due to causes and conditions characteristic of and peculiar to plaintiffs employment with defendant-employer. Plaintiffs bilateral carpal tunnel syndrome is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, an occupational disease. N.C. Gen. Stat. 97-53(13).
2. As a result of his contraction of a compensable occupational disease, plaintiff was incapable of earning wages which he was receiving at the time of the contraction of his occupational disease in the same or in any other employment for the period from March 16, 1995 through and including July 10, 1995. N.C. Gen. Stat. 97-29.
3. As a result of his contraction of a compensable occupational disease, plaintiff is entitled to temporary total disability compensation at the rate of $275.48 per week for the period from March 16, 1995 through and including July 10, 1995, in which he was absent from work due to his bilateral carpal tunnel syndrome. N.C. Gen. Stat. 97-29.
4. As a direct and proximate result of plaintiffs compensable occupational disease, plaintiff retains a 5% permanent partial disability to each hand. N.C. Gen. Stat. 97-31(12).
5. Plaintiff is entitled to compensation at the rate of $275.48 per week for a period of 20 weeks for his 5% permanent partial disability of both hands. N.C. Gen. Stat. 97-31(12).
6. On October 14, 1994, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. 97-2(6).
7. As a direct and proximate result of his compensable injury, plaintiff sustained a lower back strain, which accelerated and exacerbated his degenerative disc disease, which in turn accelerated and exacerbated his spinal stenosis causing disabling back pain. N.C. Gen. Stat. 97-2.
8. From March 7, 1996 and continuing, as a direct result of his compensable injury by accident, plaintiff was incapable of earning wages which he was receiving at the time of his injury at the same or in any other employment. N.C. Gen. Stat. 97-29.
9. Plaintiff is entitled to total disability compensation at the rate of $275.48 per week from March 7, 1996 and continuing for the disability he sustained as a result of his back injury. N.C. Gen. Stat. 97-29.
10. Plaintiff is entitled to have defendant-employer provide all medical treatment arising from his injury by accident to the extent it tends to effect a cure, give relief or lessen the period of disability. N.C. Gen. Stat. 97-25, 97-25.1.
11. The defense of this claim was reasonable and not stubborn, unfounded litigousness; therefore, plaintiff is not entitled to attorneys fees pursuant to N.C. Gen. Stat. 97-88.1.
12. Defendant-employer was not prejudiced by plaintiffs failure to provide written notice of his bilateral carpal tunnel syndrome within 30 days. N.C. Gen. Stat. 97-22.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant-employer shall pay temporary total disability compensation to plaintiff at the rate of $275.48 per week for the period from March 16, 1995 through and including July 10, 1995 for time missed due to his carpal tunnel syndrome. This amount has accrued and shall be paid in a lump sum, subject to a reasonable attorneys fee approved in Paragraph 4.
2. Defendant-employer shall pay to plaintiff, for his 5% permanent partial disability of each hand, 20 weeks of compensation at the rate of $275.48 per week. This compensation has accrued and shall be paid in a lump sum, subject to a reasonable attorneys fee approved in Paragraph 4.
3. Defendant-employer shall pay total disability compensation to plaintiff at the rate of $275.48 from March 7, 1996 and continuing until further order of the Commission. Portions of this amount have accrued and shall be paid in a lump sum, subject to a reasonable attorneys fee approved in Paragraph 4.
4. A reasonable attorneys fee of 17.5% of the compensation due under Paragraphs 1, 2 and 3 of this Award is approved for plaintiffs counsel and shall be deducted from that sum and paid directly to plaintiffs counsel.
5. Defendant shall bear the costs.
This the ______ day of April 2000.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/_______________ RENEE C. RIGGSBEE COMMISSIONER
LKM/jth